**NORTH END REALTY, LLC**

v.

**Thomas MATTOS et al.**

**No. 2009–93–Appeal.**

Supreme Court of Rhode Island.

July 8, 2011.

---

Michael A. Kelly, Esq., Providence, for Plaintiff.

Peter A. Clarkin, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

The plaintiff North End Realty, LLC (North End), appeals from a judgment of the Superior Court entered in favor of the defendants—*viz.*, the finance director, the town planner, and the members of the town council of the Town of East Greenwich (the town or East Greenwich). That judgment entered in the wake of the court's denial of the plaintiff's motion for injunctive relief, which motion had requested that the defendants be enjoined from enforcing certain specific provisions contained in several of the town's ordinances. The challenged provisions require that certain developers (of which the plaintiff is one) pay a fee-in-lieu of undertaking the construction of affordable housing.[1] On appeal, the plaintiff argues (1) that the town does not have the authority to impose the fee-in-lieu and (2) that the fee-in-lieu is an illegal tax which violates its rights under various provisions of the Rhode Island Constitution. For the reasons set forth below, we vacate the judgment of the Superior Court, and we remand the case to that tribunal with directions to grant the requested injunctive relief.

## I

### Facts and Travel

North End is a developer, and it is the owner of real property in East Greenwich. On March 28, 2006, North End filed with the town's planning board a "pre-application" for the development of a five-lot subdivision. Subsequently, on November 6, 2006, the town council of East Greenwich passed three new ordinances, the purpose of which was to promote the development

1. The shorthand expression employed by the parties when referring to the monetary imposition at issue in this case is "fee-in-lieu," and we shall adopt that usage.

of affordable housing in the town. The ordinances included a requirement that developers *either* designate 15 percent of the units in any subdivision or major residential land development as affordable housing *or* pay the sum of $200,000 as a "fee-in-lieu" of constructing the required number of affordable housing units. (Pursuant to the ordinances at issue, the "fee-in-lieu" is to be paid for *each* affordable unit that should be built so as to meet the 15 percent threshold, but which a developer did not build.)

On February 20, 2007, North End filed with the planning board both "master" and "preliminary" plans for its proposed subdivision; in those plans the developer outlined its intentions relative to the building of five residential dwellings. Because North End indicated that it did not intend to include any affordable housing units as part of the subdivision, the town (citing the recently adopted ordinances) mandated that North End pay a $200,000 fee-in-lieu before the developer would be allowed to (1) record any subdivision approval that it might receive from the planning board and (2) begin to develop the property.

On September 13, 2007, North End filed a complaint in the Superior Court for Kent County, seeking declaratory and injunctive relief against defendants. In the complaint, North End alleged that the fee-in-lieu requirement contained in the town's ordinances violated its right to substantive due process, and it further alleged that the fee-in-lieu constituted a regulatory taking in violation of article 1, section 16, of the Rhode Island Constitution and an illegal tax in violation of article 13, section 5, of the Rhode Island Constitution.

On January 7, 2008, citing Rule 65 of the Superior Court Rules of Civil Procedure, North End filed a motion for injunctive relief, requesting that East Greenwich be "enjoined from mandating a fee-in-lieu of construction of affordable housing units to be assessed and charged upon [North End] and similarly situated property owners seeking to develop and/or subdivide their property * * *." In its motion for injunctive relief, North End made the same allegations with respect to the fee-in-lieu that it had made in its September 2007 complaint, and it additionally alleged that the fee-in-lieu requirement violated its right to procedural due process and to equal protection under the Rhode Island Constitution; North End also contended that, "[m]ore importantly," the town had imposed the *"tax/fee without any explicit authority from the General Assembly* * * *." (Emphasis in original.)

On February 22, 2008, a hearing was held before a justice of the Superior Court with respect to North End's motion for injunctive relief. The parties stipulated to the facts; and, by agreement, no witnesses testified. On April 22, 2008, the hearing justice issued a written decision denying North End's motion. The hearing justice concluded that the fee-in-lieu was not an illegal tax, but was rather what the hearing justice said was an "acceptable" fee; he further concluded that the fee-in-lieu was not an unconstitutional taking and did not violate North End's right to substantive due process or equal protection. Accordingly, the hearing justice ruled that North End had failed to establish that there was a likelihood of success on the merits of its claim; for that reason, he ruled that it was not entitled to injunctive relief. Final judgment entered in favor of defendants on September 8, 2008, and North End filed a timely notice of appeal.

On appeal, North End argues that the judgment of the Superior Court should be reversed, and it requests that this Court issue an order enjoining East Greenwich from "imposing, assessing, and collecting" the fee-in-lieu. The following are North

End's contentions: (1) that the town does not have the requisite statutory authority to impose a $200,000 fee-in-lieu; (2) that the town's imposition of the fee-in-lieu constitutes an illegal tax; (3) that the fee-in-lieu violates North End's right to procedural and substantive due process and to equal protection; and (4) that the fee-in-lieu constitutes a regulatory taking without just compensation.

## II

## Standard of Review

█ It is a fundamental principle that a decision to grant or to deny injunctive relief is discretionary in nature, and such a decision will not be disturbed on appeal absent a showing of abuse of discretion or error of law. *See Fund for Community Progress v. United Way of Southeastern New England,* 695 A.2d 517, 521 (R.I.1997) ("Upon review, we will not disturb the exercise of a hearing justice's discretion on an application for a preliminary injunction unless it is reasonably clear that the hearing justice illegally exercised his or her discretion, or has abused his or her discretion.").

█ It is also a fundamental principle that we review questions of law and statutory interpretation in a *de novo* manner. *Webster v. Perrotta,* 774 A.2d 68, 75 (R.I. 2001).

## III

## Analysis

On appeal, North End first argues that East Greenwich did not have the requisite authority to impose the $200,000 fee-in-lieu provided for by the ordinances passed by the town council in 2006. North End contends that, before the town can impose "a fee of such a substantial and burdensome nature," the General Assembly must enact legislation that explicitly grants the town the authority to impose such a fee-in-lieu and that establishes "a procedure and/or process" for the implementation of fees so as to ensure that the fees are rational and reasonable.

In response, defendants argue that East Greenwich was authorized to impose the fee-in-lieu by virtue of G.L.1956 chapter 53 of title 45, which statute is known as the Rhode Island Low and Moderate Income Housing Act (LMIHA). The defendants argue that the town passed the ordinances which provide for the fee-in-lieu in order to comply with the LMIHA, and they assert that the imposition of the fee-in-lieu was authorized because the town's affordable housing plan, which contained a reference to the imposition of a fee-in-lieu, was approved by the state director of administration (the official to whom the LMIHA requires that affordable housing plans be submitted).

The LMIHA, originally enacted in 1991 (P.L.1991, ch. 154, § 1) and subsequently amended, is the product of the General Assembly's expressed intent to address what that body determined to be "an acute shortage" of affordable housing for citizens of low and moderate income in the state of Rhode Island. Section 45–53–2. In its statement of legislative findings and intent, the General Assembly declared that "it is imperative that action [be] taken immediately to assure the availability of affordable, accessible, safe, and sanitary housing for these persons;" and the General Assembly further declared that "it is necessary that each city and town provide opportunities for the establishment of low and moderate income housing * * *." *Id.*

As a means of addressing the state's affordable housing shortage, the LMIHA requires that municipalities such as East Greenwich provide affordable housing that "is in excess of ten percent (10%) of the

year-round housing units reported in the census." *See* § 45–53–3(4)(i). If a city or town had not provided the requisite number of affordable housing units, the statute provided that such a municipality must have prepared by December 31, 2004 a comprehensive plan, including a "housing element" that will bring it into compliance. *See* § 45–53–4(c).[2] The LMIHA further provides that the comprehensive plan must be adopted and approved pursuant to G.L. 1956 chapter 22.2 of title 45, the Rhode Island Comprehensive Planning and Land Use Regulation Act. *See* § 45–53–3(4)(ii). Pursuant to the latter act, the plan must be enacted by the municipality's legislative body and submitted for approval by the state director of administration. *See* § 45–22.2–8(c).

A study conducted by the Rhode Island Housing and Mortgage Finance Corporation (RIHMFC) in 2004 determined that only 4.36 percent of the housing stock in East Greenwich qualified as affordable, and it further determined that the town needed 292 additional units of affordable housing for it to meet the 10 percent requirement set forth in the LMIHA. Due to this shortfall, East Greenwich proceeded to prepare a comprehensive plan, the goal of which was to bring the town into compliance with the statute.

The plan, entitled the "Town of East Greenwich Comprehensive Community Plan Housing Element Year 2025 Afforda-

ble Housing Plan," sets forth "proposed strategies" to bring the town into compliance with the requirements of the LMIHA. Among those "strategies" was a proposal that "[a]ll major and minor subdivisions and major residential land development * * * be required to provide 15 percent affordable housing as a component of the subdivision or residential land development, or pay a fee[-]in-lieu-of the required number of affordable units." The plan further proposed that the fee-in-lieu "would be paid per unit not built as affordable housing, and the payment should be calculated based on 15 percent of the average sales price per residential unit."

The East Greenwich town council adopted the comprehensive plan on December 14, 2004, shortly before the December 31 deadline established by the LMIHA. The plan was then submitted to the state director of administration for approval; it was approved by that official on September 26, 2005. On November 6, 2006, the town council adopted three ordinances designed to implement the strategies outlined in the plan—*viz.*, Ordinance Nos. 778, 779, and 780.[3]

Ordinance No. 779 added a new "Affordable Housing" article (Article XVII) to the town's zoning ordinance; that article provides for various incentives for the construction of affordable housing—including

---

**2.** We note that G.L.1956 § 45–53–4(c) currently states that "[t]owns and cities that are not in conformity with the provisions of § 45–53–3(2)(i) shall prepare by December 31, 2004, a comprehensive plan housing element for low and moderate income housing as specified by § 45–53–3(2)(ii), consistent with applicable law and regulation." However, due to the fact that § 45–53–3(2)(i)–(ii) to which § 45–53–4(c) refers was amended in 2009 (P.L.2009, ch. 315, § 65) and currently appears as § 45–53–3(4)(i)–(ii), we cite the provisions accordingly.

**3.** The Town of East Greenwich has adopted a home rule charter pursuant to article 13 of the Rhode Island Constitution. The charter grants the town the power to "enact, amend or repeal ordinances for the preservation of the public peace, the health, safety, comfort and welfare of the inhabitants of the Town and for the protection of persons and property." East Greenwich Town Charter, Article VIII, § C–67A, *available at* http://www.courts.ri.gov/Courts/SupremeCourt/StateLaw Library/Pages/CityAndTownOrdinances.aspx.

a "[p]ayment in lieu of affordable units." *Id.* at sec. 260–99B. Ordinance No. 780 created an "Affordable Housing Commission" (Article IX), which would "receive and collect" fees-in-lieu and would deposit such fees-in-lieu into an "Affordable Housing Trust Fund." *Id.* at sec. 34–31B. The ordinance further provided that the Affordable Housing Commission would oversee the distribution of funds to loan and grant programs which the Commission would establish for the purpose of developing and preserving affordable housing.

Most significantly, Ordinance No. 778 added to the "Fees" chapter of the town's code an article (Article III) entitled "Affordable Housing Development Fees–in–Lieu of." That ordinance states that, in accordance with the LMIHA and the East Greenwich comprehensive plan, it was the finding of the town council that:

> "[F]ees may be paid to the Town in-lieu-of building the required number of low and moderate income housing units *with approval by* the Planning Board and *final* approval of the Town Council or fees may be required as the result of a fractional unit derived from the calculation of the total number of affordable units required for any given subdivision or land development project."[4] (Emphasis in original.)

Ordinance No. 778 provides that all fees-in-lieu that are collected will be deposited into the Affordable Housing Trust Fund "for the purposes of providing low and moderate income housing." *Id.* at 93–14D. It establishes the fee-in-lieu as "$200,000 per unit multiplied by the number of affordable units not built," and it states that the fee-in-lieu "shall be reviewed by the Town Council annually." *Id.* at 93–13 2.A. More specifically, the ordinance requires

that, for subdivisions and land development projects "where the total number of units is six or less, there shall be a payment of the fee[-]in-lieu * * * into the Affordable Housing Trust Fund at the time of recording" and that, "[w]hen no affordable units are provided, the fee shall be apportioned equally per unit and paid to the Finance Director at the time of recording." *Id.* at 93–14A., B.

North End argues that the fees-in-lieu provided for by the just-referenced ordinances is illegal because, in North End's opinion, the town "has no authority from either the State Constitution or the General Assembly for the imposition of such fee[s];" the developer asserts that "there is no statutory scheme in place which authorizes the imposition of such fees, nor governs and/or maintains the same." North End further argues that only the General Assembly has the power to enact laws that have a statewide impact, and it contends that "[t]he imposition of fees[-]in-lieu of the construction of affordable housing units" is "an issue of statewide concern." North End accordingly argues that the General Assembly "has the sole authority to enact legislation which governs in a uniform manner the imposition, calculation, relation, and process for the imposition of such fees that have an impact on property owners throughout the state;" the developer further notes that the General Assembly has indeed enacted such legislation in the case of development impact fees and open space fees. Although Ordinance No. 778 cites the LMIHA as a source of authority, and although Ordinance No. 779, sec. 260–98B., states that "[t]he authority for adoption and implementation of the Affordable Housing Plan is conferred by Rhode Island General Laws Sections 42–

---

**4.** Ordinance No. 778, 93–13C. defines fractional unit as "the remainder of a whole unit that is obtained when calculating the number of affordable housing units or lots based on the percent [of] affordable units required out of the total approved number of units."

128–8.1(d)(2) and (3); 45–22.2–4(33)[;] and 45–22.2–6(3)," North End emphasizes that those statutory provisions do not contain any explicit authorization for the imposition of a fee-in-lieu.

For their part, defendants do not contend that the town has *explicit* statutory authority to impose a fee-in-lieu; rather, they assert that "[t]here can be no question" that the town had authority to impose the fee-in-lieu by virtue of the fact that (1) the General Assembly in the LMIHA mandated that towns like East Greenwich adopt comprehensive plans in order to attain the goal of having at least 10 percent affordable housing; (2) the state director of administration approved East Greenwich's comprehensive plan, which plan specifically stated that all major and minor subdivisions and major residential land developments would be required to provide 15 percent affordable housing or the developer must "pay a fee[-]in-lieu-of the required number of affordable units;" and (3) the town proceeded to adopt appropriate ordinances to implement the state-approved plan. The defendants also note that RIHMFC issued materials in July of 2004 that "set[ ] forth factors to be considered by municipalities in considering the enactment of a fee-in-lieu * * * ordinance," and defendants argue that "these factors were considered, either implicitly or explicitly," by the town.[5]

A review of the LMIHA, which Ordinance No. 778 cites as a source of authority, reveals that it refers to the imposition of fees in only two places: (1) in § 45–53–4(a)(1)(viii), which sets forth the procedure relative to applications for comprehensive permits to build low and moderate income housing and provides that "[m]unicipalities may impose fees on comprehensive permit applications that are consistent with but do not exceed fees that would otherwise be assessed for a project of the same scope and type but not proceeding under this chapter;" and (2) in § 45–53–6(a), which provides that the State Housing Appeals Board is empowered to "establish a reasonable fee schedule" so as to permit it "to carry out its duties." In other words, the LMIHA is *completely silent* with respect to the subject of fees-in-lieu.

The non-LMIHA statutory provisions which the town cites in Ordinance No. 779 (*viz.*, G.L.1956 § 42–128–8.1(d)(2)–(3), § 45–22.2–4(33), and § 45–22.2–6(3)) make no reference to the imposition of any kind of fee. First, § 42–128–8.1(d)(2)–(3) provides definitions for the terms "[a]ffordable housing plan" and "[a]pproved affordable housing plan" as used in the Comprehensive Housing Production and Rehabilitation Act of 2004, but these stat-

---

**5.** In the appendix to their brief to this Court, defendants have included, with virtually no accompanying explanation, a document entitled *"Fee-in-lieu Formula;"* the document is dated July 1, 2004, and it was apparently issued by the Rhode Island Housing and Mortgage Finance Corporation (RIHMFC). That document states that a town may determine that developers will not be required to build affordable units if they pay a fee-in-lieu. The document further states as follows:

"In deciding the amount of a fee-in-lieu the ordinance needs to consider what the developer's costs might be to produce a unit of affordable housing, including current land

costs, the need for infrastructure, current construction costs, etc. The object is to create a fee that is not too low so as to make it economically advantageous for the developer to opt out of building affordable units and high enough to make a reasonable gain by the community's affordable housing trust fund or land bank if they choose to allow the developer to opt out." Although defendants describe the RIHMFC document as a "directive," the precise nature of the document is unclear in the record before us, and we are not persuaded that it meaningfully supports defendants' contentions in this case.

utory subsections make no reference to the imposition of fees. Likewise, § 45–22.2–4(1)[6] is a subsection of the Rhode Island Comprehensive Planning and Land Use Act (RICPLUA), and it defines the term "[a]ffordable housing plan" as "a component of a housing element, prepared by a town subject to planning expectations established by chapter 53 [of title 45], or a component of a housing element, prepared for the purpose of conformity with the requirements of § 42–128–8.1;" but, once again, this statutory subsection does not refer to the imposition of fees. Finally, § 45–22.2–6(3) states that a comprehensive plan under the RICPLUA must contain a "housing element" that:

> "includes an affordable housing plan that identifies housing needs in the community, including, but not limited to, the needs for low and moderate income housing, establishes goals and policies to address those needs, consistent with available resources and the need to protect public health, including drinking water supplies and safety and environmental quality. The affordable housing plan includes an implementation program of actions to be taken to effectuate the policies and goals of the affordable housing plan."

However, this statutory provision makes no reference to the imposition of fees-in-lieu as a means of effectuating the policies and goals of a town's plan. Accordingly, any authority for the imposition of the fee-in-lieu would have to be inferred either from the statutory language of the LMIHA or from the powers inuring to the town from its home rule charter.[7]

The hearing justice did not address in detail North End's argument that the town lacked the requisite statutory authority from the General Assembly to impose a fee-in-lieu of constructing affordable housing. He simply determined that the fee-in-lieu was a fee and not a tax (the imposition of which would indisputably require specific authorization from the General Assembly), and he stated that the "imposition of a fee, which will legitimately assist the town's regulatory power, is acceptable."

\*     \*     \*     \*     \*     \*

■ Without deciding (because it is not necessary to do so) whether the fee-in-lieu in actuality constitutes a fee or a tax, it is our opinion that East Greenwich may not legally impose a fee-in-lieu in the absence of enabling authority from the General Assembly. We know of no relevant precedent that would support the proposition

---

6. We note that Ordinance No. 779 enacted by the town council of East Greenwich states that it derived authority to adopt and implement its affordable housing plan pursuant to G.L.1956 § 45–22.2–4(33) rather than § 45–22.2–4(1). At the time the ordinance was enacted, § 45–22.2–4(33) provided the definition for an "affordable housing plan," but the subsection was amended in 2009 and that definition currently appears in § 45–22.2–4(1), which we cite in the text.

7. *See Westerly Residents for Thoughtful Development, Inc. v. Brancato*, 565 A.2d 1262, 1263–64 (R.I.1989) ("Rhode Island's Home Rule Amendment grants authority to every city and town to enact a home rule charter, which gives the town the right of self-government in all local matters as long as the charter is not inconsistent with [the] Constitution and laws enacted by the [G]eneral [A]ssembly in conformity with the powers reserved to the [G]eneral [A]ssembly.") (internal quotation marks omitted); *see also Newport Court Club Associates v. Town Council of Middletown*, 716 A.2d 787, 790 (R.I.1998) (noting that the authority to regulate the placement of sewers and to expand a sewer system "was inherently derived from the town's home rule charter," while, "[i]n contrast, municipalities have no inherent power to legislate on matters of statewide concern or upon matters that are specifically reserved to the General Assembly by our State Constitution").

that the authority to impose such a fee-in-lieu may be inferred from the complete silence of the General Assembly with respect to same. In our judgment, authorization for such a fee-in-lieu must be the result of the enactment of specific enabling legislation by the General Assembly.

■ We recognize the long-standing principle "that cities and towns that have adopted home rule charters are free to exercise authority over purely local concerns." *Town of East Greenwich v. O'Neil,* 617 A.2d 104, 111 (R.I.1992); *see also Westerly Residents for Thoughtful Development, Inc. v. Brancato,* 565 A.2d 1262, 1264 (R.I.1989). However, we have also held that municipalities may not "legislate on matters of statewide concern" due to the fact that "[t]he power of the General Assembly remains exclusive in those areas." *O'Neil,* 617 A.2d at 111. In determining what is a matter of local as opposed to statewide concern, we have stated that we will look to three variables for assistance: (1) whether "it appears that uniform regulation throughout the state is necessary or desirable;" (2) "whether a particular matter is traditionally within the historical dominion of one entity;" and (3) most importantly, whether "the action of a municipality has a significant effect upon people outside the home rule town or city." *Id.*

We have not to date had occasion to determine whether specific enabling authority from the General Assembly is required in order to authorize a fee-in-lieu of constructing affordable housing such as is at issue in the instant case. However, in two instances that are conceptually analogous to the situation before us, the General Assembly enacted specific enabling legislation so as to authorize the several cities and towns of this state to assess certain types of fees, which legislation also provides explicit guidance to ensure that the fees are reasonable. We are referring to the legislation authorizing the imposition of (1) development impact fees and (2) open space fees.[8] We proceed to discuss those two legislatively authorized fees.

The imposition of *development impact fees* is authorized by G.L.1956 chapter 22.4 of title 45, known as the Rhode Island Development Impact Fee Act (RIDIFA), which was enacted to address what the General Assembly determined to be a need for "an equitable program * * * for the planning and financing of public facilities to serve new growth and development in the cities and towns in order to protect the public health, safety and general welfare of the citizens of this state." Section 45-22.4-2(a). The General Assembly declared that it was "the public policy of the state and in the public interest that cities and towns are authorized to assess, impose, levy and collect fees defined herein as impact fees for all new development within their jurisdictional limits." Section 45-22.4-2(b). The General Assembly further stated that its intent in enacting the development impact legislation was to (1) "[e]nsure that adequate public facilities [were] available to serve new growth and development;" (2) "[e]nsure that new growth and development [did] not place an undue financial burden" on taxpayers; (3) promote orderly growth and development by adopting "uniform standards for local governments to require that those who benefit from new growth and development pay a proportionate fair share of the cost of new and/or upgraded public facilities needed to serve that new growth and development;" (4) "[e]stablish standards for the adoption of development impact fee ordinances by

---

8. Each of the two pieces of enabling legislation referenced in the text includes detailed mandates relative to the calculation and imposition of the respective fees.

governmental entities;" and (5) "[e]mpower governmental entities which are authorized to adopt ordinances to impose development impact fees." Section 45–22.4–2(c)(1)–(5).

The RIDIFA defines an "[i]mpact fee" as "the charge imposed upon new development by a governmental entity to fund all or a portion of the public facility's capital improvements affected by the new development from which it is collected." Section 45–22.4–3(5). The statute then sets forth specific guidelines for the calculation of such development impact fees and for the collection and expenditure of the fees, and it also provides for the refund of fees which are not expended within the required period of time. *See* §§ 45–22.4–4; 45–22.4–5; 45–22.4–6. With respect to the calculation of development impact fees, the statute states that the governmental entity considering adopting development impact fees "shall conduct a needs assessment" for the types of public facilities for which

fees are to be levied, and it states that the amount of the development impact fees "shall be based upon actual cost of public facility expansion or improvements, or reasonable estimates of the cost, to be incurred." Section 45–22.4–4(a) and (c). The statute further provides that the amount of the development impact fees "must be reasonably related to or reasonably attributable to the development's share of the cost of infrastructure improvements made necessary by the development," and it sets forth factors to be considered in order to ensure that the fees do not "exceed a proportionate share" of the costs incurred by the governmental entity in accommodating the development.[9] Section 45–22.4–4(d)(1)–(2) (emphasis added).

The RIDIFA additionally provides that the collection and expenditure of development impact fees must be "reasonably related to the benefits accruing to the devel-

---

9. General Laws 1956 § 45–22.4–4 reads as follows:

"(a) The governmental entity considering the adoption of impact fees shall conduct a needs assessment for the type of public facility or public facilities for which impact fees are to be levied. The needs assessment shall identify levels of service standards, projected public facilities capital improvements needs, and distinguish existing needs and deficiencies from future needs. The findings of this document shall be adopted by the local governmental entity.

"(b) The data sources and methodology upon which needs assessments and impact fees are based shall be made available to the public upon request.

"(c) The amount of each impact fee imposed shall be based upon actual cost of public facility expansion or improvements, or reasonable estimates of the cost, to be incurred by the governmental entity as a result of new development. The calculation of each impact fee shall be in accordance with generally accepted accounting principles.

"(d) An impact fee shall meet the following requirements:

(1) The amount of the fee must be reasonably related to or reasonably attributable to the development's share of the cost of infrastructure improvements made necessary by the development; and

(2) The impact fees imposed must not exceed a proportionate share of the costs incurred or to be incurred by the governmental entity in accommodating the development. The following factors shall be considered in determining a proportionate share of public facilities capital improvement costs:

(i) The need for public facilities' capital improvements required to serve new development, based on a capital improvements program that shows deficiencies in capital facilities serving existing development, and the means, other than impact fees, by which any existing deficiencies will be eliminated within a reasonable period of time, and that shows additional demands anticipated to be placed on specified capital facilities by new development; and

(ii) The extent to which new development is required to contribute to the cost of system improvements in the future."

opment [which is] paying the fees," and it further states that, after the impact fees are collected, the fees must be placed into a special fund. Section 45–22.4–5(a). In addition, the fees must generally be "expended or encumbered for the construction of public facilities' capital improvements" within eight years of the date of collection. Section 45–22.4–5(a)(2). Finally, if the fees are not expended or encumbered within the requisite period of time, the statute provides that the fees and accrued interest must be refunded to the payer of the fees or to his or her successors. Section 45–22.4–6(a).

Similarly, the imposition of *open space fees* is specifically authorized by G.L.1956 § 45–23–47, which states that, before a municipality may require "as a condition of approval of a proposed land development or subdivision project, dedication of land to the public, public improvements, payment-in-lieu of dedication or construction, or payment to mitigate the impacts of a proposed project," the municipality's local regulations must meet several specific requirements. For example, the statute states that "[t]he need for all dedications of land to the public and for payments-in-lieu of dedications must be clearly documented in the adopted plan of the community," and it further states that "[n]o dedications of land to the public *or payments-in-lieu* of dedications may be required until the need for the dedications are identified and documented by the municipality * * * *and the formulas for calculating a payment-in-lieu of dedication have been established in the local regulations.*" Section 45–23–47(2)–(3) (emphasis added).

In our view, the fee-in-lieu at issue in the instant case is conceptually analogous to the just-described development impact fees and open space fees, which have been authorized by explicit enactments of the General Assembly. In the same way that a development impact fee is intended to offset the impact of new growth and development in a particular municipality by requiring that those who benefit from such development pay their fair share of the cost of any new public facilities needed as a result of the development, a fee-in-lieu of constructing affordable housing is intended to offset the impact of the development of non-affordable housing in a particular municipality. When a developer constructs new non-affordable housing units, it increases the overall number of housing units in a municipality without adding any affordable units. As a result, there is a decrease in the percentage of affordable housing in that municipality; that fact necessitates the development of even more affordable housing units (than would have been required before such development) for the municipality to be able to meet the 10 percent affordable housing threshold mandated by the LMIHA. Also, a development impact fee is intended to implement a statewide policy the goal of which is to promote orderly growth and development and to provide adequate public facilities to support such development, in the same manner that a fee-in-lieu is intended as a strategy for implementing a statewide policy of increasing the availability of affordable housing in the face of the development of non-affordable housing.

In light of the foregoing considerations, it is our view that, before a municipality may impose a fee-in-lieu on developers, it must have specific statutory authorization from the General Assembly—as is the case with respect to development impact fees and open space fees. The imposition by East Greenwich of the fee-in-lieu "constitutes an action *ultra vires* of the authority delegated by the home rule charter" to the town council—due to the fact that, in imposing the fee-in-lieu, the council was not exercising its "authority over purely local concerns," which authority inures to the

town by virtue of its charter. *See O'Neil,* 617 A.2d at 111, 112. The development of affordable housing is a critical statewide need, and specific enabling legislation must be enacted by the General Assembly before municipalities in this state may impose such fees-in-lieu.

We recognize the complexity of the issues implicated by the desire to increase the availability of affordable housing in the several municipalities of this state, each of which may face challenges specific to that municipality; we also recognize the need for municipalities to have some degree of flexibility in enacting local legislation that will help the municipalities to design and implement the most effective strategies to bring them into compliance with the mandates of the LMIHA. However, although fees-in-lieu may ultimately be determined to be an effective means of achieving compliance with the statutory mandate for some municipalities in this state, strategies involving the imposition of fees-in-lieu first require the explicit authorization of the General Assembly so that the desirability and possible effects of the imposition of such fees-in-lieu can be evaluated in the context of statewide affordable housing policy. Further, it is necessary that there be a statutory framework that provides specific guidance with respect to the calculation, imposition, and use of such fees-in-lieu in order to ensure that the fees-in-lieu are reasonable and rationally related to local needs, as is the case with development impact fees and open space fees.

Although the state director of administration approved the East Greenwich comprehensive plan, which included language about a fee-in-lieu as a proposed strategy, such approval is not the equivalent of legislative authorization.

While we acknowledge East Greenwich's efforts to increase the availability of affordable housing in accordance with the LMIHA, we are unable to sustain those provisions in the town's ordinances that provide for the imposition of the fee-in-lieu. In our judgment, any such fee-in-lieu must first be authorized by the General Assembly.[10]

## IV

### Conclusion

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court. The record in this case is remanded to that tribunal with directions that it issue an order enjoining East Greenwich from imposing, assessing, or collecting the fee-in-lieu.

---

10. Because we hold that the town could not properly impose the fee-in-lieu without specific authorization from the General Assembly, we need not reach North End's other arguments with respect to the fee-in-lieu.